Brian S. King, UT Bar #4610
Laura C. Nielsen, UT Bar #15008
**LAW OFFICE OF BRIAN S. KING**
336 South 300 East, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
laura@briansking.com

Attorney for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RONALD E. SEAMONS,<br><br>                Plaintiff,<br>v.<br><br>DESERET MUTUAL BENEFIT ADMINISTRATORS,<br><br>                Defendant. | Civil No. 2:14-CV-00499 BCW<br><br>COMPLAINT |

Plaintiff. Ronald E. Seamons, through his undersigned counsel, complains and alleges against Defendant, as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff Ronald E. Seamons ("Ron") is a natural person residing in Utah County, State of Utah.

2. Ron is the Assistant Dean for the Marriott School of Management at Brigham Young University ("BYU"). BYU offers various benefits to its employees and their dependents including, but not limited to, a group life insurance benefit plan ("the Plan").

3. Ron and his late wife, Karen Seamons ("Karen"), elected coverage under the Plan at the basic rate and later opted to pay extra premium for additional coverage under a supplemental policy.

4. Defendant Deseret Mutual Benefits Administrators ("DMBA") is a non-profit corporation doing business in the State of Utah. DMBA is the insurer for the Plan.

5. Although the Plan is sponsored by a religious employer and would ordinarily be outside the scope of the Employee Retirement Income Security Act of 1974 ("ERISA"), BYU and DMBA have opted in to ERISA and as a result, the Plan is an employee welfare benefits plan under 29 U.S.C. §1001 et. seq.

6. This is an action brought under ERISA. This Court has jurisdiction of this case under 29 U.S.C.§ 1132(e)(1). Venue is appropriate under 29 U.S.C. § 1132(e)(2) and 29 U.S.C. § 1391(c) because the parties reside or do business in the State of Utah.

7. The remedies Plaintiff seeks under the terms of ERISA and under the terms of the Plan are for benefits due him pursuant to 29 U.S.C. §1132(a)(1)(B) in connection with Karen's death, for an award of prejudgment interest pursuant to U.C.A. §15-1-1, and for an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

8. Ron and Karen elected basic coverage under the Plan on or about June 1, 1994.

9. In February of 2012, Ron and Karen prepared and submitted an application for supplemental coverage under the Plan in the amount of $200,000.

10. They completed a Health Questionnaire and submitted it with their application.

11. On the Health Questionnaire, Karen disclosed the following: that she was taking prescribed medications -- specifically Lexapro and Lorazepam; and she had undergone implantation of a pacemaker in 2003.

12. The Plan arranged for Karen to have an in-person medical examination in connection with her application for the supplemental life insurance coverage. On March 8, 2012, Karen was examined and discussed her health conditions with the examiner, Guadalupe Daralos.

13. Karen told Ms. Daralos that she was taking the Lexapro for treatment of depression and Lorazepam for treatment of anxiety. She also noted semiannual doctor visits to check that the pacemaker was operating correctly.

14. As part of the examination, Karen completed a medical questionnaire which included the following question:

> Have you ever consulted a medical practitioner, or so far as you know, been treated for any: Disorder of the brain, or nervous system (e.g. mental illness, seizure fainting, or loss of consciousness, severe headaches, tremors, etc.

15. Karen responded "no" to the question.

16. Karen had seen a neurologist, Dr. Groves, in January of 2012, complaining of memory problems.

17. Dr. Groves determined that Karen was severely depressed and that her depression was significantly contributing to a "pseudodementia[1]," the most likely cause of

---

[1] "Neurology Dementia-like Sx due to psychologic impairment–eg, depression or histrionic episode, characterized by cognitive impairment of short duration, with preserved attention and ability to concentrate, and a variable performance in tests with similar levels of difficulty; it is often transient, common in the elderly and may be linked to medications–anticholinergics, barbiturates, benzodiazepines, butyrophenones, corticosteroids, digitalis, IMAOs, TCAs or due to depression–with physical and emotional deprivation, accompanied by apathy, akinesia and anxiety; pseudodementia also occurs in normal pressure hydrocephalus, Creutzfeldt-Jakob, Huntington's, Parkinson's, Pick's, Wilson's diseases, and endocrinopathy." McGraw-Hill Concise Dictionary of Modern Medicine. 2002

Karen's memory problems. Dr. Groves also opined that "hypoxic encephalopathy related to asystole[2]" could also be contributing to Karen's memory deficits.

18. Dr. Groves did not diagnose a disorder of the brain or nervous system for Karen.

19. Karen died of cardiac arrest on May 5, 2013 and Ron submitted a claim for the benefit he and Karen had enrolled in and paid for.

20. DMBA paid the base benefit in the amount of $16,000 but denied additional payment of the supplemental benefit, alleging that the supplemental coverage was not in effect in light of Karen's "misrepresentations" when she applied for the coverage.

21. Ron retained an attorney, Brian C. Harrison, to assist him in appealing DMBA's denial of the supplemental benefit.

22. Mr. Harrison wrote to DMBA on May 28, 2013. He included with his letter several documents including a copy of Karen's death certificate, a copy of Ron's pay stub showing withholding of the premium for supplemental benefits, a copy of Karen's obituary, and an medical journal article which contained information about "cardiac cachexia," the cause of Karen's death.

23. Mr. Harrison pointed out to DMBA that the condition which caused Karen's death was cardiac arrest. Although "dementia" was also listed on Karen's death certificate as an "other significant condition," the dementia was not causally related to her death.

24. Mr. Harrison concluded his letter with requests for 1) the original life insurance contract; 2) a copy of the application completed by Ron and Karen in 1994; 3) a copy

---

[2] Hypoxic encephalopathy refers to oxygen shortage (hypoxia) in the brain (encephal) and asystole is a conditionwhich occurs when the heart does not beat properly. In other words, Karen's heart problem, with irregular heart beat, may have resulted in oxygen shortage to her brain and related memory problems.

4

of the supplemental group contract; and 4) a copy of the application completed by Ron and Karen in 2012.

25. On October 24, 2013, DMBA responded to the appeal. DMBA maintained its denial on the basis that Karen had misrepresented her health conditions on her application for the supplemental coverage in 2012. As a result, the supplemental benefits were not available and would not be paid to Ron.

26. Included with the DMBA letter were copies of the 2012 supplemental benefit application, the Health Questionnaire submitted with the 2012 application, and the notes prepared by Ms. Daralos during her examination of Karen in 2012.

27. DMBA did not produce copies of either insurance policy or contract, as requested by Mr. Harrison.

28. DMBA informed Ron that he had exhausted the pre-litigation appeal process.

## CAUSE OF ACTION
### Claim for Benefits Pursuant to 29 U.S.C. §1132(a)(1)(B)

29. ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon plan fiduciaries, namely that they "discharge [their] duties in respect to claims processing solely in the interests of the participants and beneficiaries of the plan." 29 U.S.C. §1104(a)(1).

30. ERISA also underscores the particular importance of accurate claims processing and evaluations by requiring that administrators provide a "full and fair review" of claim denials. 29 U.S.C. § 1104(a)(1).

31. DMBA breached its fiduciary duty when it failed to comply with its obligations under 29 U.S.C. § 1104 and 29 U.S.C. § 1133 to act solely for the exclusive purpose of

providing benefits to Plan participants and beneficiaries when it, or its agents, failed to provide a full and fair review of Ron's denied claim.

32. DMBA's actions are in violation of ERISA, demonstrate a significant conflict of interest in DMBA's decision-making process and are a breach of the terms and provisions of the Plan establishing the rights and liabilities of the parties.

33. The failure and refusal of DMBA to pay benefits according to the terms of the Plan has resulted in a loss to Ron of the insurance benefits he and Karen elected and paid for.

34. The failure and refusal of DMBA to produce the relevant information and documents requested by Mr. Harrison, Ron's former counsel and authorized representative, within thirty days of the request is a violation of the requirements of 29 U.S.C. §1024(b)(4).

35. This failure to provide the requested materials impeded Ron's ability to determine the extent and scope of coverage available to him under the Plan and precluded his ability to fully appeal the denial of benefits.

36. Ron is entitled to an Order for payment of the supplemental life insurance benefits.

37. In addition, Ron is entitled to an award of pre- and post-judgment interest pursuant to U.C.A. §15-1-1, and an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

WHEREFOR, Plaintiff prays for relief as follows:

1. On Plaintiff's Cause of Action, for an Order that DMBA must pay the supplemental life insurance benefits elected by Ron and Karen, for an award of prejudgment interest

pursuant to U.S.C. §15-1-1, and an award of attorney fees pursuant to 29 U.S.C. §1132(g); and

2. For such further relief as the Court finds equitable.

DATED this 8th day of July, 2014.

                                                       s/ Brian S. King
                                                      Brian S. King
                                                      Attorney for Plaintiff

Plaintiff's Address:
Utah County, State of Utah