IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RONALD E. SEAMONS,<br><br>                    Plaintiff,<br><br>v.<br><br>DESERET MUTUAL BENEFIT<br>ADMINISTRATORS,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:14-cv-00499-DN<br><br>District Judge David Nuffer |

Plaintiff Ronald E. Seamons seeks an award of benefits under 29 U.S.C. § 1132(a)(1)(B) for the death of his wife, Karen Seamons, who was enrolled in a group life benefits plan sponsored by defendant, Deseret Mutual Benefit Administrators ("DMBA" or Defendant). Mr. Seamons has filed a motion[1] for summary judgment ("Motion") on his claim for benefits.[2] After careful review and consideration of the parties' memoranda, the pre-litigation record,[3] and the applicable law, Plaintiff's Motion is denied for the reasons set forth below.

Table of Contents

UNDISPUTED FACTS ............................................................................................................. 2
STANDARD OF REVIEW ...................................................................................................... 10
DISCUSSION ............................................................................................................................ 11
    1.     The Arbitrary and Capricious Standard Applies to the Plan Administrator's
          Actions ....................................................................................................................... 11
    2.     DMBA Decision To Deny Mr. Seamons's Claim And Rescind His Coverage Was
          Not Arbitrary Or Capricious ..................................................................................... 15
          A.     DMBA did not act arbitrarily or capriciously in its decision to not further
                investigate Mrs. Seamons's medical records ........................................... 15

---

[1] Plaintiff's Motion for Summary Judgment ("Motion"), docket no. 18, filed August 31, 2015.

[2] Complaint, docket no. 2, filed July 8, 2014.

[3] Joint Pre-Litigation Record ("Record"), docket no. 15, filed August 28, 2015.

B. DMBA's determination that Mrs. Seamons made a misstatement on the Paramedical Exam questionnaire was reasonable and supported by substantial evidence ................................................................ 17

C. The actual cause of Mrs. Seamons's death is immaterial to DBMA's decision to rescind coverage .................................................. 20

ORDER ........................................................................................................... 21

## UNDISPUTED FACTS

1. In 1994, Ron and Karen [Seamons] enrolled in the group life . . . benefit plan sponsored by BYU and administered by DMBA.[4]

2. Ron and Karen [Seamons] applied for supplemental coverage under the group life . . . benefit . . . in the amount of $ 200,000.00 in 2012."[5]

3. On the application for supplemental coverage, Karen answered "yes" to each of the following questions:

> Do any of the persons listed here have (or have they had) any of the following? . . . If you answered "yes" to any of the items listed, give full details below.

> Current prescription medication (list below name of drug, illness being treated, and duration) . . .

> Heart disorder, enlarged heart, murmur, irregular heart beats, chest pain . . . Liver, kidney, ureter, gallbladder, pancreas, thyroid disorders, hepatitis . . .

> Respiratory or lunch disease, asthma, shortness of breath, pneumonia[.][6]

4. Karen went on to provide information about her prescription medications and the pacemaker procedure she had undergone in 2003.[7]

---

[4] Motion at 3, ¶ 1; Opposition to Plaintiff's Motion for Summary Judgment 4–5 ("Opposition"), docket no. 25, filed October 23, 2015 (DMBA disputes that the plan is an insurance plan. It states that it is a self-funded basic group life benefit plan. The disputed word "insurance" has been removed.).

[5] Motion at 3, ¶ 2; Opposition at 5 (DMBA disputes that the supplemental group life benefit is either an insurance policy or a separate 'plan.' The disputed words "insurance" and "plan" have been removed.).

[6] Motion at 3–4, ¶ 3 (undisputed); *see* Record at 81.

[7] Motion at 4, ¶ 4 (undisputed).

2

5.      DMBA wrote to Ron on February 21, 2012, after receiving the application, and requested that he provide:

> a statement from Karen's cardiologist regarding her pacemaker. Include the diagnosed cardiac condition requiring pacing, any cardiac related hospitalizations, symptoms, functional capacity, pacer log, past EKGs, the current status and the prognosis.[8]

6.      Ron provided the requested medical records to DMBA.[9]

7.      The records provided by Ron to DMBA were records from Chun Hwang, M.D., Karen's cardiologist. On his February 18, 2010 office note, Dr. Hwang indicated under "Assessment:" "POTS and near syncope." Dr. Hwang also indicated Karen's prescription for Lexapro.[10]

8.      Dr. Hwang went on to note: "Pt has possibly depressive disorder and no arrhythmic events."[11]

9.      A "Paramedical Exam" [for Karen] was completed on March 8, 2012.[12]

10.      One of the questions during the [P]aramedical [E]xam asked whether Karen had ["ever consulted a medical practitioner, or so far as you know, been treated for any:"]

> Disorder of the brain or nervous system (e.g. mental illness, seizure, fainting or loss of consciousness, severe headaches, tremors, etc.)

> Karen's response to this question was "no".[13]

11.      The notes compiled during the [P]aramedical [E]xam document Karen's cardiac condition and her depression and anxiety.[14]

---

[8] *Id.* ¶ 5 (undisputed); *see* Record at 2.

[9] Motion at 4, ¶ 6 (undisputed); *see* Record at 3–76.

[10] Motion at 4, ¶ 7 (undisputed); *see* Record at 7.

[11] Motion at 5, ¶ 8 (undisputed); *see* Record at 8.

[12] Motion at 5, ¶ 9; Opposition at 7 (DMBA disputed that the exam was completed "in light of the conditions Karen disclosed on her application." The record cited does not indicate why the Paramedical Exam was performed. The disputed language has been removed.). *See* Record at 84–86.

[13] Motion at 5, ¶ 10 (undisputed); *see* Record at 84.

12. Ron and Karen's application for supplemental coverage was approved by DMBA in the amount of $150,000.00.[15]

13. Karen died on May 5, 2013. The cause of death indicated on the Certificate of Death was:

> Cardiac Arrest
> Due to (or as consequence of):
> Due to (or as a consequence of): Cardiac Cachexia [Onset: 1 Month].
> Due to (or as a consequence of): Cardiac Arrhythmia [Onset: 9 Years].
> Other significant conditions: Dementia
> Tobacco Use: Non-user
> Medical Examiner Contacted: No Autopsy Performed: No
> Manner of Death: Natural[16]

14. Ron submitted an application for the life . . . benefits. DMBA contacted Ron on May 15, 2013 and informed him that a review of the claim was required because Karen's death had occurred less than two years after the supplemental coverage was approved. DMBA requested the following information from Ron:

> Date of diagnosis of her dementia or related brain/neurological condition[.]
> Include complete diagnosis, symptoms and date treatment began[.] Date of
> diagnosis of her cardiac cachexia.[17]

15. The information subsequently provided by Mr. Seamons to DMBA revealed that Mrs. Seamons was referred to neurologist Jeff Groves by Dr. James Clark "for memory loss evaluation," which evaluation occurred on January 16, 2012.[18]

---

[14] Motion at 5, ¶ 11 (undisputed); *see* Record at 86.

[15] Motion at 5, ¶ 13 (undisputed); *see* Record at 1.

[16] Motion at 7, ¶ 22 (undisputed); *see* Record at 209.

[17] Motion at 7, ¶ 23; Opposition at 11 (DMBA disputed the word "insurance." The disputed word has been removed.); *see* Record at 178.

[18] Opposition at 20, ¶ 12; Plaintiff's Reply Memorandum in Support of his Motion for Summary Judgment at 4 ("Reply"), docket no. 33, filed December 22, 2015 (Mr. Seamons does not dispute this fact, but proceeds to argue that the referral did not relate to any diagnosis or treatment for dementia.). *See* Record at 106.

16.     [Although] Dr. Grove's[] and her primary care physician, Dr. Clark['s names were provided] on the form completed during the [P]aramedical [E]xam.[19]

17.     Mrs. Seamons failed to disclose that Dr. Groves is a neurologist.[20]

18.     Mrs. Seamons did not disclose that Dr. Clark referred her to a neurologist[, Dr. Groves].[21]

19.     [Mrs. Seamons did not disclose that a]s recommended by Dr. Clark, Mrs. Seamons was evaluated by Dr. Groves, a neurologist.[22]

20.     Dr. Groves' evaluation of Mrs. Seamons' revealed "possible underlying hypoxic encephalopathy [brain damage from lack of oxygen]" and discussed getting an MRI for Mrs. Seamons' brain.[23]

21.     Mrs. Seamons failed to disclose that, at the recommendation of Dr. Groves, she had recently undergone an extensive neuro[psychological] evaluation [on February 21, 2012 administered by Kent H. Gregory, Psy.D].[24]

22.     Dr. Gregory's Neuropsychological Examination was a comprehensive evaluation for Karen and noted serious deficits in Karen's memory functioning. Dr. Gregory observed that

---

[19] Motion at 5, ¶ 12; Opposition at 8 (DMBA agrees that the name "Dr. Grove" was provided on the form, but disputes that Karen identified him as her neurologist. The disputed language has been removed.). *See* Record at 86.

[20] Opposition at 21, ¶ 20; Reply at 7 (Mr. Seamons does not dispute this fact, but provides additional argument, inappropriate for the fact section, as to whether Mrs. Seamons had an obligation to make such a disclosure.).

[21] Opposition at 20, ¶ 14 (undisputed).

[22] *Id.* ¶ 15; Reply at 6 (Mr. Seamons does not dispute this, except to add that the referral was for evaluation of memory loss.). *See* Record at 84.

[23] Opposition at 20, ¶ 16; Reply at 6 (Mr. Seamons does not dispute this fact, but proceeds to argue neither he nor Karen had any knowledge of the possible causes of Karen's memory loss. This argument is inappropriate for the fact section.).

[24] Opposition at 21, ¶ 21; Reply at 7 (Mr. Seamons does not dispute this fact, but provides additional argument, inappropriate for the fact section, as to whether Mrs. Seamons had an obligation to make such a disclosure.). *See* Record 192–200.

Karen was experiencing significant emotional distress in coping with her declining health and was "displaying a number of potentially troubling psychological symptoms."[25]

23.    Dr. Gregory's diagnoses included "Cognitive Disorder NOS [not otherwise specified]" and "Adjustment Disorder with Mixed Anxiety and Depressed Mood, Chronic."[26]

24.    Dr. Gregory recommended occupational therapy, along with speech and physical therapy, to address Karen's memory and attention problems and suggested that psychotherapy could be helpful in addressing Karen's ongoing depression and other psychological issues.[27]

25.    The neuro[psychological] evaluation resulted in Mrs. Seamons being diagnosed with Cognitive Disorder NOS.[28]

26.    The only treatment Mrs. Seamons disclosed she had received at Utah Valley Regional Medical Center is her pacemaker operation in 2003.[29]

27.    Mrs. Seamons signed the Paramedical Exam on March 8, 2013, wherein it states,

I declare that all information contained with this Paramedical Exam is, to the best of my knowledge, true, correct, and recorded in its entirety by the examiner. I understand that this information will be used to help determine eligibility for coverage and that any falsification, omission or misstatement may be grounds to void the coverage.[30]

28.    On May 22, 2013, DMBA wrote again to Ron and stated that during the review of the claim, information had come to light to indicate that a "materially significant medical condition" has been diagnosed prior to the application for supplemental coverage and had not

---

[25] Motion at 9, ¶ 31 (undisputed); *see* Record at 116.

[26] Motion at 9, ¶ 32 (undisputed).

[27] *Id.* ¶ 33 (undisputed); *see* Record at 117.

[28] Record at 198.

[29] Opposition at 21, ¶ 23 (undisputed).

[30] *Id.* ¶ 25; Reply at 9 (Mr. Seamons does not dispute this fact, but provides additional argument, inappropriate for the fact section, as to whether DMBA bears responsibility to investigate the information provided by Mrs. Seamons.).

been disclosed on the application or during the underwriting process. As a result, DMBA was rescinding the supplemental coverage and stated that Ron's premiums would be reimbursed to him.[31]

29.     Underwriting guidelines utilized by DMBA state that diagnoses of "mild cognitive impairment, delirium, or dementia" indicates a level of unacceptable risk and "[i]ndividuals with this impairment are generally not considered good candidates for preferred consideration."[32]

30.     Ron emailed an appeal of DMBA's denial and on May 28, 2013, DMBA upheld the rescission of the supplemental coverage. DMBA maintained its position that Karen had failed to disclose a materially significant medical condition on the application.[33]

31.     Ron retained the services of an attorney, Brian Harrison, to assist him in pursing his claim for the supplemental benefit. Following the telephone conversation between DMBA and Mr. Harrison, DMBA wrote [a letter, on July 1, 2013, providing information regarding its prior denial].[34]

32.     DMBA supported its position that a diagnosed condition had not been disclosed with the enclosure of records from Maple Creek, a hospice program where Karen had been evaluated for services. The "Oasis Assessment Worksheet" completed for Maple Creek by Carma Karsten, indicated that Karen had a "tx of dementia which was diagnosed 9 yrs ago."[35]

---

[31] Motion at 8, ¶ 24 (undisputed); *see* Record at 177.

[32] Motion at 8, ¶ 25 (undisputed); *see* Record at 216.

[33] Motion at 8, ¶ 26 (undisputed); *see* Record at 173.

[34] Motion at 8, ¶ 27; Opposition at 12 (DMBA disputes that the July 1, 2013 letter was either an appellate decision or the affirming of a prior appellate decision. The document speaks for itself. The disputed language has been removed.). *See* Record at 229–230.

[35] Motion at 8, ¶ 28 (undisputed); *see* Record at 147.

33.     DMBA also included with its [July 1, 2013] letter the records of a Neuropsychological Examination completed for Karen on February 21, 2012 by Kent Gregory, Psy.D.,[36] and the notes from DMBA's March 8, 2012 Paramedical exam.[37] [The records of the Neuropsychological Examination of February 21, 2012 by Kent Gregory, Psy.D. were first provided by the plaintiff to DMBA after Mrs. Seamons died, in response to its request for additional information.][38]

34.     DMBA asserted in its letter that Karen's answer of "no" to the question on the Paramedical Exam about disorders of the brain misrepresented her medical conditions as she had undergone the Neuropsychological Examination approximately two weeks earlier.[39]

35.     Mr. Harrison submitted an appeal on Ron's behalf and included a number of medical records in support of his argument that Karen had not been diagnosed with dementia prior to her application for supplemental coverage.[40]

36.     Mr. Harrison's appeal also included an Affidavit from Carma Karsten, the individual who had completed the assessment for hospice care at Maple Creek. Ms. Karsten swore in her Affidavit that her statement about Karen's diagnosis of dementia was in error. Mr. Karsten stated that she had reviewed Karen's medical records and found no diagnosis of dementia.[41]

---

[36] Record at 110–118.

[37] Record at 84–86.

[38] Motion at 8, ¶ 29; Opposition at 12 (DMBA does not dispute that the stated information was provided to Mr. Seamons, it simply clarifies that it was not in possession of the Neuropsychological Examination when the original eligibility determination was made in 2012. DMBA's clarification is not disputed by Mr. Seamons, therefore it is included in the undisputed fact).

[39] Motion at 9, ¶ 30 (undisputed); *see* Record at 229.

[40] Motion at 10, ¶ 36 (undisputed); *see* Record at 103–140.

[41] Motion at 10, ¶ 37 (undisputed); *see* Record 133–135.

37.     Ms. Karsten also stated that the neuropsychological evaluation was in connection with Karen's depression and memory issues and not dementia.[42]

38.     All of Karen's medical care providers' records[, which were provided to DMBA after Mrs. Seamons' death,][43] document ongoing depression and anxiety as a major contributing factor to her memory problems.[44]

39.     On October 24, 2013, DMBA maintained its denial.[45]

40.     Ron exhausted the prelitigation appeal process as required by ERISA.[46]

41.     Ron retained the services of the Law Firm of Brian S. King ("the Firm") to assist him in litigating his claim. The Firm filed its Complaint in this matter on July 8, 2014.[47]

42.     The Firm served discovery requests on DMBA on January 13, 2015. A copy of the Plaintiff's First Interrogatories and Requests for Production of Documents is attached hereto as Exhibit A.[48]

43.     In Ron's Interrogatory No. 4, he asked for:

> any and all internal guidelines, policies, procedures, claims handling manuals, training manuals or materials or other documents identifying how DMBA evaluates and processes both original applications for group life insurance coverage and requests for increases in life insurance coverage, whether when an application is initially made or during investigation and underwriting of an application.[49]

44.     Ron's Requests for Production of Documents included:

---

[42] Motion at 10, ¶ 38 (undisputed); *see* Record 133–135.

[43] Record 103–104.

[44] Motion at 10, ¶ 39; Opposition at 15 (DMBA does not dispute this fact, but clarifies that the medical care providers' records in question were not provided to DMBA until after Mrs. Seamons' death. The undisputed fact has been edited to reflect this additional fact.). *See* Record at 108, 122, 126, 130.

[45] Motion at 10, ¶ 40 (undisputed); *see* Record 77–79.

[46] Motion at 10, ¶ 42 (undisputed); *see* Record 79.

[47] Motion at 11, ¶ 43 (undisputed); *see* Complaint.

[48] Motion at 11, ¶ 44 (undisputed); *see* Exhibit A, docket no. 19-1, filed September 2, 2015.

[49] Motion at 11, ¶ 45 (undisputed).

REQUEST NO. 1: Produce each and every document identified or relied on in preparing your responses to the Interrogatories above.

. . .

REQUEST NO. 5: Produce any and all claims manuals, policy and procedure manuals, training manuals, personnel policies, guidelines, instructions, training materials or any other documents that describe how DMBA does or will conduct its activities in processing or evaluating life insurance claims.

REQUEST NO. 6: Produce any and all audio recordings, video recordings, transcripts of interview or any other record of examinations conducted with Karen during the evaluation, underwriting, and approval of her application for increased life insurance benefits.[50]

45.     Ron also asked for other documents from DMBA. Specifically, he requested

relevant Plan documents:

REQUEST NO. 2: Produce each and every document under which the Plan at issue is established or operated including, but not limited to, contracts, insurance policies, plan documents, administrative agreements, payments of premium, and payments of funds for "reserves" or other purposes.[51]

46.     The only underwriting guidelines produced by DMBA are found in the Record at

216–217. Those guidelines related only to cognitive impairment and dementia. DMBA never

produced underwriting guidelines relating to the cardiac or mental health conditions disclosed by

Karen in her application materials and no other underwriting guidelines are in the Record. [52]

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."[53] A factual dispute is genuine when

"there is sufficient evidence on each side so that a rational trier of fact could resolve the issue

---

[50] *Id.* ¶ 46 (undisputed).

[51] *Id.* ¶ 47 (undisputed).

[52] *Id.* ¶ 48 (undisputed).

[53] Fed. R. Civ. P. 56(a).

either way."[54] In determining whether there is a genuine dispute as to material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[55]

## DISCUSSION

### 1. The Arbitrary and Capricious Standard Applies to the Plan Administrator's Actions

Mr. Seamons brings his claim pursuant to 29 U.S.C. § 1132(a)(1)(B),  which "is to be reviewed under a de novo standard unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan."[56] And, "if the plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the plan's terms[,]" then an arbitrary and capricious standard applies to a plan administrator's actions.[57] Under the arbitrary and capricious standard, the Defendant's determination must be upheld so long as it is reasonable.[58] "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary."[59]

Here, both the "Your Supplemental Group Term Life Insurance Owner's Manual" ("Owner's Manual") and the "Deseret Healthcare Supplemental Group Term Life Plan Rider"

---

[54] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[55] *Id.*

[56] Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

[57] *Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1132, 1135 (10th Cir. 1998).

[58] W*eber v. GE Grp. Life Assurance Co.,* 541 F.3d 1002, 1010 (10th Cir.2008) (quoting M*iller v. Monumental Life Ins. Co.,* 502 F.3d 1245, 1250 (10th Cir.2007)) (internal quotation marks and citations omitted).

[59] C*aldwell v. Life Ins. Co. of N.A.,* 287 F.3d 1276, 1282 (10th Cir.2002) (citing S*andoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 380 (10th Cir.1992)).

("Rider") set forth language granting the administrator discretionary authority, therefore, an arbitrary and capricious standard applies.[60]

Mr. Seamons initially argues that Utah insurance code, U.C.A. § 31A-21-105, applies and that the standard of review is de novo.[61] DMBA, in opposition, provides several meritorious reasons why ERISA and related federal case law is applicable, instead of Utah law and its corresponding cases.[62] In reply, Mr. Seamons appears to concede that "language is found in the Plan documents included in the Record which notifies Plan participants of DMBA's discretion and authority to determine eligibility for benefits and interpret the terms of the Plan;[63] that the Plan is governed by ERISA; and that this Court's standard of review is abuse of discretion."[64]

Mr. Seamons, nonetheless, argues that DMBA's "conflict of interest calls for a significantly reduced degree of deference in this Court's review of DMBA's decision-making process and ultimate denial of the claim."[65] Mr. Seamons points out that "DMBA makes determinations about eligibility for benefits and DMBA pays eligibility claims from its own funds."[66] This, according to Mr. Seamons, is an inherent conflict of interest.[67] The Tenth Circuit has provided a non-exhaustive list of facts that courts should consider in deciding whether a conflict of interest exists. These factors include, whether:

---

[60] Owner's Manual, Record at 235 ("Deseret Mutual has full discretionary authority to interpret the plan and to determine eligibility. Desert Mutual also has the sole right to construe plan terms. All Deseret Mutual decisions relating to plan terms or eligibility are binding and conclusive."); Rider, Record at 240 ("Deseret Healthcare will require evidence of insurability with the application, and will retain the sole responsibility to approve or disprove SGTL coverage for the Employee, spouse or children (including newborn children) based on medical history provided by the applicant or otherwise obtained by Deseret Healthcare.").

[61] Motion at 12–21.

[62] Opposition at 22–27.

[63] Record at 235.

[64] Reply at 15.

[65] Motion at 20.

[66] *Id.* at 21.

[67] *Id.*

(1) the plan is self-funded; (2) the company funding the plan appointed and compensated the plan administrator; (3) the plan administrator's performance reviews or level of compensation were linked to the denial of benefits; and (4) the provision of benefits had a significant economic impact on the company administering the plan.[68]

DMBA contends that no inherent conflict of interest exists. DMBA cites to its additional undisputed facts which set forth the structure of the association, the functional relationship between DMBA and the Deseret Healthcare Employee Benefits Trust ("Trust"), and the claims handling practices of DMBA.[69] These additional facts originate from Pamela J. Larsen's Declaration.[70] In response to DMBA's additional undisputed facts, Mr. Seamons argued that he

> has insufficient information to dispute or otherwise respond to DMBA's statement. The documents under which the Benefits Trust is established or operated are not a part of the pre-litigation record as produced to Ron by DMBA and submitted with Ron's Motion for Summary Judgment. DMBA also failed to produce the documents as exhibits to the Declaration of Panela J. Larsen, filed concurrently with DBMA's . . . Opposition to the . . . Motion. As such, any provisions of those documents are outside the scope of this Court's review.[71]

Courts "have considered evidence outside the administrative record for limited purposes."[72] One such purpose is to determine whether a conflict of interest exists, and the nature and extent of the conflict. Accordingly, the declaration of Ms. Larsen may be considered for the limited purpose of determining whether the Plan administrator's decision was affected by a conflict of interest. Ms. Larsen declares:

---

[68] *Pitman v. Blue Cross & Blue Shield of Oklahoma*, 217 F.3d 1291, 1296 (10th Cir. 2000).

[69] Opposition at 18–19.

[70] Declaration of Pamela J. Larsen, docket no. 26, filed October 23, 2015.

[71] Reply at 2–4.

[72] *Baker v. Tomkins Indus., Inc.,* 339 F. Supp. 2d 1177, 1181 (D. Kan. 2004) (citing *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 977 (9th Cir. 1999) (holding that evidence outside the administrative record may be considered to determine if a plan administrator's decision was affected by its conflict of interest.")); *see also Kohut v. Hartford Life & Acc. Ins. Co.*, 710 F. Supp. 2d 1139, 1152 (D. Colo. 2008) (providing a list of Tenth Circuit district court cases resolving this issue).

1.  The Trust offers various health, disability, and life benefits, collectively referred to and administered as a single "Deseret Healthcare Employee Benefit Plan" ("Plan").

2.  The Deseret Healthcare Employee Benefits Trust is a self-funded voluntary employees' beneficiary association, established under Section 501(c)(9) of the Internal Revenue Code, which provides for the payment of life, health, accident or other benefits to its members . . . . These benefits include the group life benefit and a supplemental group life benefit, which is also a self-funded benefit.

3.  The Trust also qualifies for exemption from federal income tax under Section 50l(c)(9) of the Internal Revenue Code, because no part of the net earnings of the Trust inures, other than by payment of life, health, accident, or other benefits to its members or their dependents or designated beneficiaries, to the benefit of any private shareholder or individual, and substantially all of its operations are in furtherance of providing these benefits.

4.  DMBA is a non-profit corporation, separate from the Benefits Trust, which acts as trustee of the Benefits Trust and handles claims administration for the Benefits Trust and the Plan.

5.  Under the Administrative Services Agreement between DMBA and the Trust, DMBA is required to administer the Plan strictly in accordance with the terms of the Plan.

6.  Employers contributing to the Trust do not make, direct, or have any association with DMBA's claim decisions.

7.  DMBA is compensated by the Trust for actual costs of administration on an incurred basis. Neither DMBA nor its plan managers and claim specialists receive compensation, awards, bonuses, other financial benefits or performance recognition based upon either the value or the number of claims they deny.[73]

The unrebutted Larsen declaration shows there is no inherent conflict of interest. The Trust is the insurer and DMBA is a separate corporation which acts as the trustee and administers the Trust benefits. Further, DMBA is compensated by the Trust for actual costs of administration, and there appears to be no benefit to DMBA for its determinations favorable to the Trust.

---

[73] *See* Declaration of Pamela J. Larsen.

**2. DMBA Decision to Deny Mr. Seamons's Claim and Rescind His Coverage Was Not Arbitrary or Capricious**

As previously mentioned, all of the arguments in Mr. Seamons's Motion are based on

Utah law. Mr. Seamons, however, states in his reply that although

> the applicable law is not the Utah insurance code but the ERISA statute and case law interpreting that[,] . . . the principles of law outlined in the [Motion] and in other cases across the country dealing with rescission, whether governed by ERISA or not, identify the factors this Court should take into account in evaluating whether DMBA's actions in rescinding Karen's supplemental coverage was justified.[74]

Mr. Seamons advances three arguments in support of his position that DMBA's decision

to deny his claim and rescind his coverage was arbitrary and capricious. Each argument is

addressed in turn.

A. *DMBA did not act arbitrarily or capriciously in its decision to not further investigate Mrs. Seamons's medical records*

Mr. Seamons contends that DMBA acted arbitrarily in failing to investigate

Mrs. Seamons's application.[75] Mr. Seamons states that DMBA had the ability "to obtain medical

information as part of its process of evaluating and deciding whether to provide additional life

insurance coverage."[76] Mr. Seamons points out that "[w]hen DMBA initially received the

application for SGTL coverage and saw Karen's medical history involving a pacemaker, DMBA

. . . requested that [Mr. Seamons] provide specific information from Karen's cardiologist about

her heart condition."[77] According to Mr. Seamons, DMBA should have "follow[ed] up on other

---

[74] Reply at 11.

[75] *Id.* at 16.

[76] *Id.* at 17 (citing Record at 240).

[77] *Id*.

information Karen disclosed about her health history that was more than sufficient to give

DMBA notice of potential significant medical problems."[78]

DMBA contends that Mrs. Seamons disclosed insufficient information to give DMBA

notice of any potential significant medical problems.[79] DMBA states that although Mrs. Seamons

provided Dr. Groves's name on the form completed during her Paramedical Exam, "he was not

identified as a neurologist. Indeed, from the way the form was filled in, the applicant provided

Dr. Groves' name only in a supplemental response to question 4(a), which asked, among other

things, if Mrs. Seamons had been advised to have an MRI or other diagnostic study."[80]  DMBA

further argues that "under the terms of the Rider, DMBA is not responsible to 'uncover' all the

information that may be discoverable through interrogating every provider disclosed by every

applicant.[81] Rather, the onus is on the applicant to provide DMBA with evidence of insurability

with their application."[82]

Mr. Seamons cites several cases in support of his position.[83] However, these cases are

inapplicable. *Major Oil Corp. v. Equitable Life Assurance Society,*[84] and *Wootton v. Combined

Ins. Co.,*[85] both deal with Utah insurance law. And although *Caldwell v. Life Ins. Co. of N. Am.,*[86]

is an ERISA case, it does not recognize a duty or a requirement on the part of the plan

administrator to investigate, it simply holds that less deference is given "if a plan administrator

---

[78] *Id.*

[79] Opposition at 36.

[80] *Id.*

[81] Record at 239–249.

[82] Opposition at 37 (citing Record at 240).

[83] Reply at 17.

[84] 457 F.2d 596, 603 (10th Cir. 1972).

[85] 395 P.2d 724 (Utah 1964).

[86] 287 F.3d 1276, 1282 (10th Cir. 2002).

fails to gather or examine relevant evidence."[87] Mr. Seamons contends that there is language in the Rider creating a duty to investigate.[88] Mr. Seamons cites to the following language in the Rider document:

> Deseret Healthcare will require evidence of insurability with the application, and will retain the sole responsibility to approve and disapprove SGTL coverage for the Employee, spouse or children (including newborn children) based on the medical history provided by the applicant or otherwise obtained by Deseret Healthcare.[89]

The cited language, however, does not impose a duty to investigate. Mr. Seamons has failed to cite any portion of the record or any legal authorities to support his contention. Accordingly, DMBA decision to not further investigate Mrs. Seamons's application was not arbitrary and capricious.

B. *DMBA's determination that Mrs. Seamons made a misstatement on the Paramedical Exam questionnaire was reasonable and supported by substantial evidence*

Mr. Seamons argues that DMBA's right to rescission is governed by federal common law.[90] Federal common law, according to Mr. Seamons, requires that the misstatement or omission be material.[91] Mr. Seamons contends that DMBA has failed to prove that Mrs. Seamons's omitted information was material.[92] Although district and circuit courts around the country have considered the issue of whether an insurer is entitled to rescind an ERISA policy based on material misrepresentation in a policy application, it appears that these cases

---

[87] *Id.*

[88] Reply at 8.

[89] Record 240.

[90] Reply at 11–12.

[91] *Id.* at 19.

[92] *Id.* at 18–19.

applied federal common law in the absence of any specific policy language or provision granting the insurer the right to rescind.[93]

When the terms of an ERISA plan are unambiguous, a reviewing court construes them as a matter of law and gives the language of the plan its ordinary meaning.[94] Here, the Paramedical Exam Mrs. Seamons signed on March 8, 2013, states,

> I declare that all information contained with this Paramedical Exam is, to the best of my knowledge, true, correct, and recorded in its entirety by the examiner. I understand that this information will be used to help determine eligibility for coverage and that any falsification, omission or misstatement may be grounds to void the coverage.[95]

This provision is unambiguous. It allows DMBA to rescind coverage for any falsification, omission or misstatement. There is no knowledge or intent requirement. Although the first sentence states "to the best of my knowledge," this sentence stands independent of and does not qualify the second sentence. There is also no materiality requirement.[96]

The March 8, 2013, Paramedical Exam questionnaire asked Mrs. Seamons whether she had "ever consulted a medical practitioner, or so far as you know, been treated for any: disorder of the brain, or nervous system (e.g. mental illness, seizure, fainting, or loss of consciousness, severe headaches, tremors, etc.)?"[97] Mrs. Seamons responded "no".[98] Additionally, the

---

[93] *Sec. Life Ins. Co. of Am. v. Meyling*, 146 F.3d 1184, 1186 (9th Cir. 1998), as amended on denial of reh'g and reh'g en banc (Sept. 14, 1998) (finding a federal common law right of rescission under ERISA after concluding that "the policy does not expressly provide Security Life any remedy for misstatements regarding health information. There is no provision for rescission, and the termination section does not include misrepresentation as a basis upon which to cancel the policy.").

[94] *Welch v. Unum Life Ins. Co. Of Am.*, 382 F.3d 1078, 1082 (10th Cir. 2004).

[95] Undisputed fact ¶ 27.

[96] Even if this provision imposed a materiality requirement, the fact that the Paramedical Exam questionnaire contained the question inquiring about brain disorders indicates that Mrs. Seamons's response was relevant in influencing the insurer's decision.  *See Shipley v. Arkansas Blue Cross and Blue Shield*, 333 F.3d 898 (8th Cir. 2003) ("In cases governed by ERISA, misstatements or omissions have been deemed material where knowledge of the true facts would have influenced the insurer's decision to accept the risk or its assessment of the premium amount.").

[97] Record at 85–86.

questionnaire asked Mrs. Seamons to provide the date and reason she last consulted with her primary physician. She wrote "3 wks ago physical exam (normal)."[99] DMBA contends that Mrs. Seamons's answers to the above two questions and her failure to disclose certain information constitute a misstatement or omission within the meaning of the plan. The critical information is: (1) that Dr. Clark referred her to a neurologist (Dr. Grove); (2) she was later evaluated by Dr. Grove; and (3) that at the recommendation of Dr. Groves, she underwent an extensive neuropsychological evaluation administered by Dr. Gregory.[100]

Under the arbitrary and capricious standard of review, the question to be resolved is whether DMBA was reasonable in finding that Mrs. Seamons omitted or misstated her answers to the questions posed in the questionnaire. It was unreasonable for DMBA to find that Mrs. Seamons omitted or misstated her answer to question asking the "date and reason" she last consulted her primary physician. DMBA does not dispute that Mrs. Seamons's *reason* for her last consult was for a physical exam. Instead, DMBA argues that Mrs. Seamons failed to disclose that the *outcome or result* of her last consult with her primary physician was that she was referred to a neurologist. The question, however, does not ask for the outcome or result of the consult.

DMBA also claims Mrs. Seamons did not correctly answer that she had "ever consulted a medical practitioner" regarding a disorder of the brain, Mr. Seamons argues that the question "is poorly drafted and simply does not do the trick. It is unreasonable for DMBA to propose that Karen had an obligation to read between the lines and interpret its ambiguously worded question

---

[98] *Id.* at 84.

[99] *Id.*

[100] Opposition at 36.

to include memory loss."[101] Mr. Seamons further states that "[a] reasonable person in the position of Ron or Karen Seamons would not believe the question about 'disorders of the brain or nervous system' was intended to specifically require disclosure of Karen's memory problems or confusion."[102] The undisputed facts show that a few weeks prior to answering this question, Mrs. Seamons had been evaluated by a neurologist and a neuropsychologist, and had undergone an extensive neuropsychological evaluation.[103] Applying the deferential abuse of discretion standard, DMBA was reasonable in finding that Mrs. Seamons had consulted a medical professional regarding a "disorder of the brain." Also, DMBA's determination that Mrs. Seamons made a misstatement on the Paramedical Exam questionnaire was reasonable and supported by substantial evidence.

C. *The actual cause of Mrs. Seamons's death is immaterial to DBMA's decision to rescind coverage*

Mr. Seamons's remaining argument is insufficiently developed. He argues that "[t]he Record does not show that dementia was a contributing factor to Karen's death."[104] He then states:

> At the time DMBA evaluated Karen's application, it asked for information about Karen's pacemaker and her heart condition and determined that she was still eligible for SGTL coverage. Those conditions, not dementia, were the causes of Karen's death. It was a violation of DMBA's fiduciary duty to Ron, and an arbitrary and capricious exercise of DMBA's discretion, to change course after Ron filed his claim and assert that Karen had lied about her health when she completed her application.[105]

---

[101] Motion at 25–26.

[102] *Id.* at 25.

[103] Undisputed fact ¶¶ 19–22.

[104] Reply at 21.

[105] *Id.* at 21–22.

Mr. Seamons has failed to cite any portion of the record or any legal authorities to support his contention. This argument fails.

## ORDER

IT IS HEREBY ORDERED that Mr. Seamons's Motion[106] for summary judgment is DENIED.

Under the Federal Rules of Civil Procedure Rule 56(f), after giving notice and a reasonable time to respond, the court may grant summary judgment for nonmovant DMBA. DMBA has not moved for summary judgment, but it appears entry of summary judgment against Mr. Seamons is possible. IT IS FURTHER ORDERED that Mr. Seamons may file a response to this possible grant of summary judgment on or before Friday, January 27, 2017.


Dated January 9, 2017.

BY THE COURT:

David Nuffer
United States District Judge

---

[106] Docket no. 18.